Henry BROWN, Plaintiff,

v.

EAST MISSISSIPPI ELECTRIC POWER ASSOCIATION, Defendant.

Civ. A. No. E90–0100(L).

United States District Court, S.D. Mississippi, E.D.

Oct. 29, 1991.

Alison Steiner, Adelman & Steiner, Hattiesburg, MS, for plaintiff.

Kenneth E. Milam, Watkins & Eager, Jackson, MS and J.L. Prichard, Deen, Cameron, Prichard, Young & Kittrell, Meridian, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Defendant East Mississippi Electric Power Association (EMEPA) is a rural electric power association which provides electrical service in various counties in southeast Mississippi. Henry Brown, a black male, became employed by EMEPA in 1967 as a janitor. Over the years, he was promoted to various positions in the company, including positions on EMEPA line crews, which install and maintain EMEPA's transmission lines, and to the position of right-of-way foreman, whose job it was to supervise crews clearing EMEPA's power lines. Brown was eventually promoted from the line to the position of serviceman, in which he performed such functions as installing or "setting" meters, pulling meters (discontinuing service by request), working trouble outages, hooking up new homes for permanent service, and occasionally performing collection work. He occupied the position of serviceman until he separated from employment with EMEPA on March 20, 1989. It is for the court to determine in this action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., the circumstances and reason for Brown's leaving the employ of EMEPA. Brown claims that he was fired by EMEPA because of his race and in retaliation for his having filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). EMEPA, however, maintains that as a result of repeated complaints from customers, Brown was offered a transfer to a position that did not require customer contact, but Brown elected to quit his job with EMEPA rather than accept the offer of transfer. Based on the evidence adduced at the non-jury trial of this cause, the court makes the following findings of fact and conclusions of law.

As stated, Brown was hired by EMEPA in 1967 as a janitor. After three years, he began working in EMEPA's warehouse as a clerk. Two years later, he was moved to the position of grounds maintenance keeper, but when he let it be known that he was dissatisfied with that job, he was transferred to a groundman position, the entry level position on the EMEPA line. He received a promotion to apprentice lineman, then was made a right-of-way foreman. After an incident which will hereafter be treated in greater detail, Brown was demoted to apprentice lineman, but was thereafter promoted to lineman. While still a lineman, Brown started training for the job of serviceman. At the time, EMEPA had two servicemen in its Meridian office, but management saw a need for a third position. Brown was selected for the position by Leon Pippen, EMEPA's director of customer relations and Brown's immediate supervisor. He worked as a service trainee for approximately a year and a half before becoming a serviceman.

As a serviceman, Brown was assigned to a specific service area, and was responsible for the customers in that area.[1] Following a complaint by a customer, Jerry May, of Brown's rudeness and his use of profanity, hereafter referred to as the May incident, he was assigned to a different territory, which culminated in his filing a charge of discrimination with the EEOC.[2] He was warned by Tom Murray, EMEPA's general manager, following that incident that if another customer complained, he would be terminated. When, in March 1989, an irate customer, Bill McKinnion, complained that Brown had driven recklessly and cursed at him, Brown was

---

[1]. He was on call during the week and every fourth weekend of the month, and was assigned a truck for the purpose of his performing his duties. He was provided keys to the truck and to the EMEPA building. Servicemen work alone and therefore enjoy a degree of independence not experienced by employees in other positions with EMEPA.

[2]. Brown contended in his charge that under the same circumstances, a white serviceman would not have been reprimanded nor his route changed.

offered an opportunity to return to the line or be terminated. The incident resulted in Brown's leaving the employ of EMEPA.

The evidence was uncontroverted that while he was a serviceman, Brown was the subject of numerous customer complaints. Murray testified concerning disciplinary problems relating to customer complaints experienced during Brown's employment with EMEPA. Murray said that prior to the May incident, which resulted in Brown's route being changed, complaints about Brown's relationships with customers had come to his attention. He had received a number of complaints by telephone and was advised by Pippen that Pippen was also getting complaints, as were the cashiers. The complaints concerned rudeness and the use of abusive language toward customers.

On Friday, August 24, 1988, a confrontation occurred between Brown and a disgruntled customer named Jerry May when Brown went to the May residence to disconnect the power, as requested by May's wife. When Brown arrived, May objected to his disconnecting the power, and Brown left. When Brown returned later in the day at Pippen's direction, both Mr. and Mrs. May were present and Brown disconnected the power, after he and Mr. May exchanged some words. Murray testified that the following Monday morning, Jerry May came to the EMEPA office, requesting to see him. Murray met with a furious May, who said that he and Brown had gotten into a heated dispute when Brown came to disconnect his service, and that in the course of their discussion, Brown had cursed him. Murray recalled that May said that if Brown was ever back on his property, he'd kill him. Murray thereafter talked with Pippen about what had happened, and before making any decision as to how to handle the matter, spoke with Brown. Brown admitted there was a heated argument, but denied cursing May. Murray decided that the best course of action under the circumstances was to move Brown to a different service territory. Murray told Brown at that time that EMEPA continued to receive customer complaints about Brown and

that he thought it would be best if Brown went back to the line so that he would not have to deal with customers. Brown, however, asked to remain on the service truck, so Murray acceded to his request, though Brown was given a written warning and told by Murray that if EMEPA received one more complaint, Brown would be terminated.

His new route, being located farther from his home, was not as convenient to Brown as had been his original service route, but Brown continued to perform his duties as serviceman. Wayne Henson, EMEPA's assistant general manager, testified that after the May incident and the change in Brown's service territory, EMEPA received additional complaints about Brown. In September or October 1988, for example, a customer, Ms. Viator, called and stated, without explanation, that she did not want Brown back on her property. In December 1988, a customer named Wilburn called about a problem he had experienced with Brown; Brown, while at the customer's home, had been demonstrably angry about having to work on that occasion. Additionally, another customer complained about Brown's abusive manner. This customer also said that she did not want Brown back on her property.

Murray testified that during 1988 and early 1989, Brown generally seemed very upset. EMEPA received complaints not only from customers, but also from other employees. Brown, he said, would barely speak and was uncooperative. In short, he was very dissatisfied. On March 7, 1989, prior to the McKinnion incident, Murray called Brown into his office and told him that EMEPA had received complaints from some customers, and that something needed to be done about Brown's lack of cooperation and poor attitude. Brown denied that he had an attitude problem, according to Murray, and said that if he had any problem, it was with Pippen, his supervisor.[3] Murray did not remember the nature of or any details concerning Brown's problem with Pippen. A warning was placed in his file dated March 7, 1989, documenting Brown's attitude and customer relation problems and the meeting to discuss

---

3. Pippen had supervisory authority over Brown while he was a lineman, and when plaintiff became a serviceman, Pippen was his direct supervisor.

those matters. Thereafter, Pippen came to Murray's office on Friday afternoon, March 17, 1989, was very upset and advised Murray that it seemed there had arisen another customer relations problem involving Brown. He was referring to the McKinnion incident. An EMEPA customer, he said, Bill McKinnion, had called and was quite upset; according to McKinnion, Brown had been abusive and used profanity.

Murray communicated with McKinnion by telephone, and was told that Brown had been driving down a gravel drive and had slung rocks onto McKinnion's property; when McKinnion approached Brown, saying something about his fast driving, Brown, McKinnion reported, said to him, "Don't be a smartass." McKinnion, Murray said, was very angry, and told Murray that he would shoot Brown if he ever came back on his property.

The following Monday, Pippen, at Murray's request, contacted McKinnion and requested that he come to the EMEPA office and give a statement concerning his version of the incident. McKinnion obliged and came in that afternoon; with EMEPA's counsel present, he made a statement in accordance with what he had told Murray over the phone.[4] However, before McKinnion arrived to make his statement, Murray talked to Brown, telling him that there had been another "pretty violent reaction" from a customer, and asking to hear Brown's side of the story. Brown admitted that there had been a heated discussion with McKinnion, but denied that he had acted rudely or cursed McKinnion. He was told to return to work and that Murray would talk to him again later in the day.

Following his meeting with Brown, Murray met with Pippen and Henson to discuss the problems with Brown and determine what should be done. Murray expressed that though he had warned Brown that he would be fired in the event of another customer complaint, he felt that in light of Brown's 22 years' service and the fact that his work was otherwise satisfactory, he should be given another chance. Apparently after Pippen left the meeting, Murray decided that he would offer Brown a chance to be transferred back to the line at the same rate of pay.

The following morning, Murray, Pippen and Henson met with Brown. Murray advised Brown that as a result of customer complaints which had not ceased despite his warnings to Brown, Brown was being removed from the service truck and transferred to a line crew. Brown became emotional and protested the transfer, which he said was a demotion and was retaliatory. The meeting ended with Brown leaving EMEPA.

█ Brown contends in this action that he was discriminated against on the basis of race on two occasions: In August 1988, when he was transferred from one service territory to another, and again in March 1989, when he was either terminated or constructively discharged. The first question for the court's consideration is whether Brown was in fact terminated, or constructively discharged, or left employment with EMEPA voluntarily.

In the course of the March 17 meeting,[5] Murray told Brown that he was suspending him for three days, in which time Brown could think about what he wanted to do; he could either take the line job or pick up his check. Brown, however, announced that he was going to take two weeks' vacation, then began rambling about bringing "all of this"

---

4. Plaintiff claims that it was "unusual" that McKinnion was asked to sign a sworn statement and meet with the general manager in the presence of the company's attorney, as that had never before been done in response to a customer complaint. Murray explained that he felt that given the fact that there was pending an EEOC charge by Brown, he was required to proceed very carefully in taking any action against Brown. Brown had already been warned that adverse employment action would result in the event of another complaint. The customer's written statement was taken and EMEPA's counsel was asked to be present as a protective measure, in the event of future litigation, and in the court's opinion, such actions were reasonable under the circumstances.

5. Unbeknownst to Murray, Henson or Pippen, Brown, apparently anticipating that some adverse employment action would be taken against him, took a tape recorder to and recorded the meeting. Brown turned the tape over to the EEOC which, unbeknownst to Brown, transcribed it.

out "for the public to know it." At that point in the conversation, Murray, obviously frustrated, told Brown, "I tell you what you do— You pick up your check. Go get his check...." Brown said, "So you—you're firing me, huh?" Initially, Murray said, "Yeah," but then backed off and told Brown, "I just offered you a choice.... If you want that choice you take it. If you don't we're gonna write you a check...." Brown finally told Murray,

> Mr. Murray, like I said, that's a demotion for me and its coming from retaliation and like I said, I'm being used ... so you know, y'all got it together and I did not do what that man said I done and I'm being used. So that's ah, I'm gonna leave it at that. I'm not gone argue with you. You done told me to write my check so, you're the boss. Y'all run it. So ... I'll get my stuff and call my wife and tell her to come get me.... You said ... what's for me to do today then. I didn't have nothing else to ... I ain't got nothing else to do....

Brown left Murray's office with Pippen, heading for Pippen's office to fill out vacation forms. He kept repeating,

> He fired me. I'm gonna call her to come get me. Nah, that's allright. I'll make it.... Man ain't right. I'm gonna leave him alone. I ain't ain't gone say no more. He done done what he had to do so just ... No, I'm gone leave him alone.... I ain't gone sit down there and beg that man because I ain't got no house payment or no car payments or nothing so I'm gone let him—I'm gone let him have his way. Yes sir. I'm gone leave.

Pippen urged Brown to take two weeks to think about what he was doing and urged him to accept the transfer to the line. Brown expressed his anger at Murray for his decision, and made a statement to Pippen about his being fired. Pippen responded,

> Pippen: Let me ask you something. Did we fire you? No sir. We sure did not fire you.
>
> Brown: That's a demotion for me.... I'll just take whatever's coming to me cause I ain't—I ain't....
>
> Pippen: You quit?

> Brown: That's the only thing I know to do. Cause I'm not gone take a demotion and it ain't right and he knows it ain't right. It's retaliation. So I'm gone let that man go on. I ain't fooling with him.

Pippen continued to urge Brown to stay and accept the line job:

> Pippen: You want to take 2 weeks vacation then you let me know where you.... Henry, think about this thing. Don't jump up and.... Look here, Henry. Daggonnit don't jump up and do something that I'm gone to regret and you are too. I don't want to see you quit....
>
> Don't jump up and quit. You think about this thing Henry. I know everybody's got to work so....

Despite Pippen's efforts, Brown returned to Murray's office and said,

> I want to say one more thing to you. I'm fixing to go, I'm fixing to go to the house. OK, then OK. I ain't fixing to get smart with you. I'm going to the house. I'm gone mind my own business.... Y'all done made your ruling. I didn't come down here to tell you I wanted you to change it.... Cause now I don't have a job cause I know you had authority just like you told me awhile ago you could write my check. I know you can.

Murray responded by telling Brown to

> [t]hink this thing through before you throw everything away. You got 22 years invested.... Like I say, just take 2 weeks of vacation—don't make any committment— think this thing through but to work in situation day after day with all this tension and stuff—I'd go to that line crew in a minute.
>
> Think about you know—your retirement program and all the benefits and all this stuff that you got here—you know you don't throw that all away. You know it's too much to throw away and sometimes you know sometimes—I'm always said that any man that's ever left here I didn't fire him—he fired himself but what we got into with and you'll think it through if you just quietly don't listen to nobody else just do Henry's thing? Don't listen to nobody; just think it to yourself but you got 22

years investment here. Sonny ... would said he would love to have you on his crew. But shucks, you look at it as a demotion..... But to walk right out and say I'm gonna either have this or I'm gonna throw this whole 24 years out the window. Henson described an additional conversation he had with Brown while Brown was clearing out his service truck. Henson stated that he did not want to see Brown quit, and told Brown that he wished he would reconsider his decision. Brown responded, saying something to the effect of, "I'm just gonna go on down the road." Finally, before leaving the building, Brown threw some workshirts into Pippen's office, saying, "I'm not going to be needing these no more," [6] and stuck his head in Murray's office saying, "I'm going on down the road." Brown waved as he walked down the hall and out of the building. The next morning, Marce Goforth, a white who had been an assistant serviceman for about three months, was sent out in a service truck, replacing Brown.

A day or so after the March 17 meeting, Brown telephoned Wayne Henson to instruct Henson as to what to do with Brown's paycheck. Brown told Henson that he wanted to talk to him and Howard Trawick, a line supervisor, about his situation. According to Henson, Brown asked him if the offer to return was still open. Henson told him that the decision was not his to make, but as far as he knew, the position was available. Henson asked if Brown had talked to Murray about it, but Brown responded that he had not and was not going to talk to Murray. On May 27, Murray wrote Brown a letter saying that EMEPA had accepted his resignation. When Brown called Murray to talk about the letter and explain that he had not resigned, Murray refused to discuss the matter further, saying that a decision had been made. Murray hung the phone up and that apparently represented Brown's last communica-

tion with EMEPA concerning his employment status with the company. Thereafter, on March 27, 1989, plaintiff filed an additional charge of discrimination with the EEOC in which he alleged that he was demoted because of his race and in retaliation for filing his original EEOC charge.

Brown testified that his understanding, following the meeting, was that he would take a two-week vacation, after which he would return as a lineman.[7] However, Murray, Henson and Pippen each testified that by the time he left that day, Brown had quit. The transcript of the conversations which occurred that day appears to confirm this understanding. They understood Brown's use of the phrase, "going on down the road" to mean that he was quitting. Whether or not it was his intention to leave the impression that he was quitting, that is clearly what is indicated by the transcript.[8] Even after his telephone conversation with Brown a few days later, Henson did not think that Brown was coming back to work. Since he had effectively resigned, Henson said, the only way that Brown could return to work was to deal directly with Murray, and Brown said he was not going to talk to Murray. Though Brown denied that he refused to talk with Murray, the court finds Henson's testimony credible. Moreover, the proof showed that Brown at no time indicated that he would accept a transfer to the line. Accordingly, it is the court's opinion that Brown was not terminated, but rather quit his employment with EMEPA.

■ Plaintiff argues that even if EMEPA officials somehow misinterpreted his words and deeds during and after the March 17 meeting, and thereby perceived him to have accepted the discharge in lieu of transfer, acceptance by him of the discharge under the circumstances meets the criteria necessary to establish constructive discharge. Plaintiff

---

6. Brown testified that he turned the shirts in because they were the wrong size. The court found his testimony on this point not credible.

7. He also testified, though, that upon leaving the meeting, he believed he had been fired.

8. Plaintiff offers an interesting interpretation of the transcript, claiming that the transcript shows

that the conversation was focused on plaintiff's taking a two-week vacation and considering the choice of returning as a lineman or not at all. While the transcript shows that statements to that effect were made, they were made by Murray and Pippen; Brown for the most part ignored those statements and talked about "going on" and "quitting."

argues that what was offered to him was not a transfer, but rather was a demotion since a move from serviceman to lineman would result in a cut in pay which he was not required to accept. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982) (employee not required to accept demotion as condition of damage mitigation); *see also Jurgens v. EEOC*, 903 F.2d 386, 391 (5th Cir.1990)) (quoting *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980) (if employer deliberately makes employee's working conditions so intolerable that employee is forced into involuntary resignation, employer has committed constructive discharge and is liable as if it formally discharged employee); *Jett v. Dallas Independent School Dist.*, 798 F.2d 748, 756 (5th Cir.1986), *mod. on other grounds*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (demotion or transfer in some instances may constitute constructive discharge). On the topic of pay, Murray testified that he had the authority to make decisions about pay, and had decided to maintain Brown at the same pay because he knew that if he did not do so, it would become an "issue," and there were already "enough issues on the table." Brown, however, was never advised that the change to lineman would not carry with it an accompanying reduction in pay.[9] In the court's view, under the circumstances, plaintiff could reasonably have believed that the transfer to the line which was offered him as a disciplinary action was a demotion which would carry with it a reduction in pay.[10] Though the court credits Murray's testimony that he did not intend to decrease Brown's pay and further is of the opinion that the offer of transfer to the line was not intended to be a demotion for Brown, the court will nevertheless assume for present purposes that such a transfer would have been a demo-

tion. The court, though, need not determine whether plaintiff has established constructive discharge since the court is of the opinion that in any event, plaintiff has not established that any adverse employment action undertaken with respect to him was racially motivated. Under the model for establishing a claim of discriminatory treatment established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and thereafter clarified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the plaintiff, to establish a prima facie case of discriminatory discharge based on alleged disparity in an employer's imposition of discipline, must prove:

1. He is a member of a protected group;

2. There was a company policy or practice concerning the activity for which he was disciplined;

3. Non-minority employees were either given the benefit of a more lenient company practice or policy concerning this activity or were not held to compliance with a strict company policy or practice concerning this activity; and

4. The minority employee was disciplined either without the application of the lenient policy or in conformance with the strict one.

*Chescheir v. Liberty Mutual Ins. Co.*, 713 F.2d 1142 (5th Cir.1983). Should the plaintiff succeed in proving a prima facie case of discrimination, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for its actions. Plaintiff must thereafter prove that the articulated reasons were not its true reasons but were pretext for unlawful discrimination. The ultimate question, though, is whether the de-

---

**9.** Pippen confirmed that there was no mention in the March 17 meeting concerning the rate of pay Brown would receive if he accepted the transfer to the lineman position; however, though he had no control over Brown's pay, Pippen "didn't feel like" the transfer would have entailed a pay decrease.

**10.** The evidence demonstrated that employees have transferred from the line crew to serviceman and vice versa for numerous reasons, both voluntary and involuntary. Whether or not a

move from serviceman to the line crew was in fact a "demotion," or was considered to be an equivalent position, apparently depended on whom you asked. In Henry Brown's case, however, it is uncontroverted that each of the EME-PA managers recognized that Brown was opposed to returning to the line. He had previously refused offers to transfer to the line, preferring to remain on the service truck, and on the occasion in question, he insisted that for him, the move would be a demotion.

fendant intentionally discriminated against the plaintiff. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). In the case at bar, Murray and Henson each testified that neither race nor the EEOC charge had anything to do with their decision, and the court, having considered the record as a whole, finds that to be the case.

It should first be noted that no one has contended in this case that Brown did not possess the technical ability to perform the duties required of a serviceman and indeed, the proof showed that he was proficient and performed the technical aspects of the job well. The question, though, is whether the disciplinary action taken against Brown was racially motivated, as Brown contends, or whether, as defendant contends, it was the result of repeated customer complaints concerning Brown.

Contrary to plaintiff's characterization, this case does not appear to present a situation in which EMEPA officials simply elected to take the word of complaining customers, all of whom were white, over that of its black employee. Brown himself acknowledged that over the years, he had received numerous warnings, both written and oral, and that there were complaints by customers about his conduct. He did not suggest that the May or McKinnion complaints which resulted in disciplinary action were manufactured. Brown further acknowledged that following the May incident, Murray had said that he would not tolerate complaints from customers and that if Brown were the subject of one more complaint, Murray would fire him. Brown was given an opportunity at that time to go on a line crew so that he would not have to deal with customers, but was not interested in that option. It was clear to Brown at that time, though, that if another customer complained, he would be "gone."

While it now appears that the customers' versions of the May and McKinnion incidents may not have been altogether accurate, it is not necessary that the court determine whether the customer complaints about Brown were true. Notably, however, the proof does not show that EMEPA officials had, at that time, reason to doubt their stories. Mrs. May testified that she contacted EMEPA immediately after the incident involving her husband and apologized for her husband's behavior. Murray, however, testified that he was not aware of her call, and there was no proof that either Pippen or Henson knew about the call. Additionally, while Mrs. May testified that she did not witness any rude or abusive conduct by Brown, she admitted that she was not present on both of the occasions that Brown was on the property and did not know what had transpired when she was not present. Moreover, though several witnesses testified that McKinnion was known in the community for having a bad reputation for peace and truthfulness,[11] neither Murray and Henson had even heard of McKinnion before the incident occurred, and though Pippen had known McKinnion twenty years earlier, the two were barely acquaintances, certainly not friends, and did not have frequent contact with each other. There was no indication that Pippen had any knowledge concerning McKinnion's reputation. Henson testified specifically that he had no reason to disbelieve McKinnion's account of the incident; McKinnion did not, according to Henson, seem unsure of anything.

In addition, it was known that Brown had been the subject of numerous customer complaints. According to Murray, there was an unusual number of customer complaints concerning Brown. EMEPA had nine servicemen at the time, yet received more complaints from customers in Brown's service area than the rest of the service areas combined. And once Brown was moved to a new service area following the May incident, in a matter of weeks, EMEPA began receiving calls about him from his new area.[12] Brown

---

**11.** Kim Culpepper and Thomas Hamner testified that Bill McKinnion was not known in the community as a peaceful man and that he had a bad reputation for truth or veracity. Norman Dallas, a Collinsville store owner, was not familiar with McKinnion's reputation for veracity, but stated that he had a bad reputation for peace.

**12.** Murray said that EMEPA did not document every single complaint that was received, but it did try to respond to each complaint in some way. In Brown's case, he said that while it was his policy to make sure that Brown knew about each complaint that was received, the company

himself did not deny that customers had complained about his conduct, but he contended that their complaints were not well founded. The probability that the company would have considered the complaints valid was also confirmed by the testimony of Kim Culpepper, a fellow serviceman and plaintiff's own witness. Culpepper described in his testimony the importance of customer satisfaction to EMEPA, and explained that because they are required to have direct contact with customers—customers who may be disgruntled—servicemen for EMEPA are required to exercise tact and diplomacy. Brown, he said, is somewhat arrogant and has a problem communicating with people. His approach to people is "sometimes offensive," to the extent that Culpepper himself tried to talk to Brown about his approach to people and how to deal with customers. Culpepper further testified that Brown used profanity as a matter of course. It was, according to Culpepper, just a part of his speech. Though Culpepper never saw Brown use profanity toward customers and stated that as far as he knew, Brown's relationships with customers were no different than that of any other serviceman, he admitted that servicemen most often work alone and that he did not know how Brown conducted himself when Culpepper was not around. Henson testified that while he had never witnessed Brown being hostile or abusive toward a supervisor, he had himself had what he described as "very strong conversations" with Brown in which he had to ask him to calm down.

Murray explained that his decision to transfer Brown to a new territory following of the May incident had nothing to do with race; it had everything to do with prior customer complaints. The May complaint, when added to others EMEPA had already received, was enough to warrant action. Since it would have been imprudent to send Brown back on the May property, Murray changed Brown's territory. He further said that he thought transferring Brown to a new territory would best serve not only EMEPA, but also Brown, since it would give him a fresh start by allowing him to service customers with whom he had no previous contact. While the transfer to the new territory may have resulted in some inconvenience to Brown, it resulted in no loss of pay or other economic detriment. Moreover, Culpepper, a white employee, was transferred to a new service territory at the same time as plaintiff, and it is thus difficult to conceive a basis for contending that the transfer decision was race based. An offer of transfer, rather than immediate termination, was extended to Brown following the McKinnion incident not because Murray doubted McKinnion, but because that represented a method by which to retain plaintiff as an employee but at the same time remove him from contact with customers.

Plaintiff asserts that while the customer complaints might appear facially to be a legitimate basis for the action taken against Brown, the appearance of legitimacy fades when one considers that a white employee, Clarence Nance, was treated substantially differently—better—under "identical circumstances." Plaintiff's argument on this point must fail, though, because the proof showed that Nance's circumstance was not at all identical to Brown's. Henson testified that on one occasion, a customer—a black female—complained about Nance's rudeness. An employee who was with Nance verified that "too much had been said." Henson told Nance that if something like that happened one more time, he would no longer be an EMEPA serviceman—he would be transferred to the line. Nance assured Henson that he would correct the problem and according to Henson, Nance's attitude improved. When asked why further action was taken with respect to Brown, a black serviceman, and not with respect to Nance, a white serviceman, Henson explained that unlike Nance, Brown's problems were repetitive. He had repeatedly talked to Brown about customer complaints, which he said were too frequent, and repeatedly offered to move Brown to the line to take him out of contact with customers. He was required to have

---

did not document each complaint. He wished in retrospect that he had done so, but not until after Brown filed his EEOC charge did EMEPA begin

to do so in each instance. Murray explained that after the EEOC charge, he felt that the company needed to proceed carefully.

that conversation with Nance only once: He told Nance only once that if there were any more problems, he would no longer drive a service truck for EMEPA. Nance, he said, understood what would happen if there were further problems. Brown apparently did not.[13]

In addition to the problems experienced by EMEPA relating to customer complaints about Brown, the evidence showed that there were other instances of conduct by Brown which resulted in disciplinary action.[14] Murray explained, for example, that in May 1977, Brown complained to Pippen about the length of time it had taken him to move from groundman to lineman, and in the course of that conversation cursed Pippen and declared that he would quit if he did not get a promotion. Pippen accepted Brown's resignation, but after a two-week vacation, Brown returned to work on the same line crew. Six months later, he was promoted to lineman on the recommendation of Pippen.[15]

Another incident resulted in Brown's being demoted from right-of-way foreman to apprentice lineman. Pippen explained that his demotion resulted from Brown's failure to wear safety gear, a violation which he witnessed twice while Brown was right-of-way foreman. According to Pippen, prior to the incident leading to Brown's demotion, Brown had complained that his hat gave him a headache and, despite a company policy and counseling by Pippen about the necessity of his wearing protective headgear, Brown had declared every morning for several weeks that he was not going to wear his hard hat. In Pippen's words, he was "on my back," and "in my face" every day about it. In the last discussion between the two prior to the demotion incident, Brown had said, "Just what are you going to do if you catch me without

my hat." Pippen responded that he would fire him. When Pippen thereafter observed Brown on the jobsite without his hard hat, he fired him. Murray, however, instead determined to suspend Brown for three days and demote him to a line crew, with a cut in pay.[16] After that, Brown wore his hard hat and was never written up again for a safety violation.

Brown cites as evidence of racial animus the use by his supervisor, Pippen, of the term "nigger." Brown described several instances involving Pippen's use of that term, the first of which occurred in 1985, prior to Brown's move to the serviceman position. Upon entering the EMEPA office one afternoon, Brown overheard Pippen telling the radio dispatcher about an automobile wreck in which he said something to the effect of, "I felt like getting my gun and killing that nigger." Two or three months later, after Brown had been assigned a service truck and a service territory, he overheard Pippen, in a conversation with Gene Jackson, another serviceman, saying to Jackson, "You should have hooked that power up for that nigger. You know how they are." On neither of these occasions did Brown confront Pippen. According to Brown, though he complained to Murray about Pippen's use of racial slurs and was told by Murray that Murray would take care of the problem, there were more such incidents. Brown testified that one morning, Pippen called him in to his office, wanting to know why Brown had stopped "mistering" him, i.e., addressing Pippen as "Mister" Leon, rather than simply as Leon. According to Brown, he had started calling him Leon since that was what the other servicemen called Pippen. Pippen, he said, who was annoyed because people who overheard Brown calling him Leon over the radio

13. Further claims of alleged disparate treatment are considered *infra* at pp. 768–69.

14. There was testimony that Brown had received complaints concerning his driving, and on the occasion of the McKinnion incident, the complaint about Brown's rudeness was indirectly related to his driving. However, in the court's view, no adverse disciplinary action was taken against Brown relating to his driving, and thus, those complaints will not be addressed.

15. Brown stated regarding that incident that Pippen, for no apparent reason, became outraged when he asked to be made an apprentice lineman. The court found his testimony in this respect not credible, particularly in light of Brown's subsequent promotion, which he received because of Pippen.

16. Murray testified that he did not think Brown's violation was serious enough to warrant termination.

were making fun of Pippen, said to Brown in that meeting, "If you call me Leon one more time on that radio, I'll call you nigger."

Additionally, Brown stated that about two months later, following the May incident, he was walking down the hall in the EMEPA office and overheard Pippen saying to Gene Jackson, a white serviceman, "Look at my little nigger going down the hall. We brung him to his knees." Finally, Brown testified that as he was walking through the office following the March 17 meeting with Murray, Henson and Pippen, he overheard Pippen say to the radio dispatcher, "We finally got what we wanted. We got rid of that little nigger."

Another EMEPA employee, Louvenia Ford, who is black, testified concerning Pippen's use of the term "nigger." Ms. Ford, a service clerk, stated that when she arrived at work early one morning, she overheard Pippen as he was walking down the hall state, "I haven't seen my little nigger friend this morning," apparently referring to Brown. She also testified that after two white co-workers told her that Pippen was using that term when referring to her, she complained to Murray. Ford stated, though, that she never heard Pippen use a racial slur in the presence of Henry Brown or directed to her, and that after her conversation with Murray, which it appears took place sometime around August 1988, Pippen was nicer and she never heard nor were there any further reports to her of his use of any more racial slurs about her.

Other EMEPA employees testified concerning Pippen's use of the term "nigger." Kim Culpepper heard Pippen use racially derogatory language, and specifically, heard him use the term "nigger," speaking of blacks in general, and of Henry Brown in particular. Indeed, according to Culpepper, as well as other witnesses, Pippen used the term often; but to his knowledge, Pippen never used the word in front of Brown. Thomas Hamner, a former line foreman with EMEPA who worked for a period of time under Pippen's supervision, stated that he had heard Pippen refer to Brown, out of Brown's presence, as "nigger" according to Hamner, Pippen once said to him, apparently referring to Brown, "I had to dust my little

nigger at the end of the day." Another witness, Jimmy Gressett, an EMEPA right-of-way supervisor, similarly testified that he heard Pippen use the word "nigger" on more than one occasion and heard him make the statement, "I had to dust my little nigger this morning." It did not happen often, he said, and he never heard him use the word in Brown's presence.

Brown claimed that he spoke with Murray concerning Pippen's use of the offensive word and that Murray told him he would take care of it; Brown, however, did not know whether Murray ever talked to Pippen. Murray confirmed that Brown complained about the way Pippen treated him, a couple of times perhaps, but according to Murray, Brown did not indicate to him that he perceived any racial problem. Murray did recall Ford's having complained about Pippen's use of the term "nigger." After receiving Ford's complaint, he advised Pippen that such conduct was in violation of association policy and if he received another complaint about it, Pippen would be terminated. Pippen similarly testified that Murray counseled with him about his saying "nigger." Pippen stated that he was left with the definite impression that if he kept using the term, Murray would fire him.

■ The evidence is uncontroverted that Pippen used the term "nigger," referring to Henry Brown as well as other black persons. Pippen himself admitted that he used the term loosely. Pippen conceded that in conversations with white persons, he used the term "nigger" off and on to refer to black persons, but stated that he did not use the word in front of Brown or any other black EMEPA employee. He characterized it as simply a term with which he had been raised that was difficult to cull from his vocabulary. After receiving a warning from Murray, however, he made every effort to refrain from his use of the word and did so on only one occasion thereafter. He explained that on that occasion, Brown, having never done so before, began referring to him over the company radio repeatedly and consistently as "Laon," not "Leon," obviously and deliberately mispronouncing Pippen's name. According to Pippen, when Brown arrived at the

office that afternoon, he called him into his office and told Brown that if he ever called him "Laon" over the radio again, he, Pippen, would retort, "What do you want, nigger." Pippen denied that he was upset by Brown's form of address, i.e., his failure to refer to Pippen as "Mister" Leon; rather, he was upset by Brown's inexplicable mispronunciation of his name.[17]

Plaintiff contends that the evidence relative to Pippen's speech constitutes proof that an illegitimate racial factor played "a motivating part in [the] employment decision[s]," *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 1790, 104 L.Ed.2d 268 (1989) (plurality opinion), or was "a substantial factor in [the] adverse employment decision[s]," *Id.* at 265, 109 S.Ct. at 1798 (O'Connor, J. concurring), so as to raise a presumption of racial discrimination. However, plaintiff presented no evidence tending to show that EMEPA condoned the use of racial slurs. The testimony was, in fact, to the contrary. Gressett believed that most EMEPA employees refrained from using the term and Hamner made it clear that Pippen was the only person at EMEPA whom he had ever heard use the term. While Hamner knew of no company policy on the matter, he testified that the company expected its black employees to be treated with respect and dignity. Gressett likewise testified that EMEPA does not condone or approve of the use of racial slurs. Further, there was no proof presented that any EMEPA employee or supervisor, other than Pippen, used the term "nigger," and when a complaint was made concerning Pippen's conduct in this regard, the company took action to put an end to it. Pippen was advised in unequivocal terms by Murray that continued use of the term would not be tolerated.

Though Brown described statements which he claimed were made by Pippen after the warning from Murray, the court finds his testimony regarding those statements wholly unbelievable. Pippen specifically and emphatically denied making the statements attributed to him by Brown, "We brung [my little nigger] to his knees," or, "We finally got rid of that little nigger," and in the court's opinion, such statements are inconsistent with the evidence considered as a whole. It is simply incredible that after earnest efforts by Pippen to persuade Brown to accept the transfer offered by Murray and stay at EMEPA, Pippen would make any such statements.

Finally, plaintiff's assertion that Pippen's speech is indicative of an attitude of racial bias which infected all of his management decisions is not supported by the record. Brown's position regarding Leon Pippen is belied by the fact that Pippen was instrumental in effecting Brown's promotion to the line crew and eventually to the position of serviceman, which Brown so coveted. Moreover, the transcript of the meeting which culminated in Brown's leaving EMEPA's employ shows that not only did Pippen not participate in any decision to terminate his employment or engage in conduct calculated to force Brown out, but rather Pippen implored Brown to accept Murray's offer of a transfer to the line crew rather than throw away all the time he had already invested in the company. Indeed, the evidence showed that in the conversations which took place on the date of his departure, Brown attributed his alleged firing not to Pippen, but to Murray and that Pippen, in fact, offered to talk to Murray on Brown's behalf.

Plaintiff suggests that the earlier disciplinary incidents involving Brown's hard hat violation and his having complained about the length of time of advancement on the line crew were the result of Pippen's punishing Brown for an "insufficiently humble attitude." However, the proof showed that disciplinary action would have been warranted in both instances based on what was, in the court's opinion, Brown's blatant defiance of Pippen's authority. The court concludes, based on the foregoing, that any subjective

---

17. Pippen's testimony was uncontroverted that while Brown had called him "Mister Leon" since he was first employed by EMEPA, Pippen had never asked Brown to address him as "Mister." Kim Culpepper also said that Brown did call Pippen "Mister" Leon, whereas the other servicemen called him Leon, but as far as he knew, Pippen did not require Brown to address him in that fashion. The court would further note Pippen's uncontradicted testimony that Goforth, a white serviceman, calls him "Mister Leon" most of the time.

racial animus which Pippen may have harbored did not affect the challenged employment actions at issue in this lawsuit.

■ Brown maintained in his testimony that in addition to his use of racial slurs, Pippen treated black employees differently than whites. Brown's testimony that Pippen treated whites more favorably than blacks is not, however, supported by the record evidence. Plaintiff first contended that evidence of discrimination was shown by the fact that white employees progressed to the position of serviceman more quickly than did black employees. In the court's opinion, the proof showed that the rate of progression depends upon and varies in accordance with an employee's training and skill, as well as position vacancies.[18]

As a further alleged example of discrimination, Brown complained, for the very first time in this litigation, that when white servicemen wanted vacation time, he would work with them to try to give them the time they wanted, but would not do the same for him. Pippen could not remember having made it difficult for anyone to take a vacation, including Brown. Further, in contrast to Brown's testimony, Kim Culpepper stated that there was, generally speaking, no difference in the way that Pippen treated the servicemen insofar as work assignments and their working relationship. Additionally, Henson stated that when Brown on one occasion complained to Henson that Pippen treated him unfairly, Henson checked the volume and type of work Brown was being assigned and found that it was no different nor was he given more work than any other serviceman.

Brown himself testified that he knew of no situation where a white serviceman was not counseled about a customer complaint, but it appeared to be his position that no white employee was ever subjected to adverse employment actions for such complaints. The evidence, though, is to the contrary. The proof showed that Sonny Owens, a meter reader, was terminated in 1987 for reports by customers of abuse.

Brown complains that no white employee was ever disciplined for a safety rules violation. On this point, Pippen remembered three instances in which he had spoken with other employees, Marce Goforth, Richard Barefield and Clarence Nance, concerning violations of safety rules. He acknowledged that he had not demoted or suspended any employee other than Brown for violating EMEPA safety rules, but stated by way of explanation that he had not caught anyone other than Brown violating safety rules more than once. No other employee had ever complained to him that he would not wear a hard hat, nor had any other employee ever challenged him in the manner that Brown had; that is, once Pippen told Brown that he would be fired if found not wearing his hard hat, Brown's subsequent failure to wear his hard hat was a direct challenge to Pippen's authority.

Further, there was proof that three white servicemen received demotions or transfers for disciplinary reasons. One, Ronnie Anderson, was involuntarily transferred from the position of serviceman to the position of lineman for poor work performance. Another, James Benton, was demoted to lineman, with a reduction in pay, for performing personal work on company time. And Lamar Chancelor was demoted from line foreman to serviceman because of his inability to supervise employees. Based on the evidence presented, the court concludes that plaintiff has failed to establish that he was treated differently from white employees.

In summary, the court is of the opinion that the proof does not establish that EMEPA's decision following the May incident to transfer Brown to a different service area and then, following the McKinnion incident, to transfer Brown to the line, were racially based nor were they motivated by retaliation.

18. Plaintiff contends also that while during a relevant time frame more white than black employees were terminated, overall, blacks are terminated in a percentage higher than their actual representation in the work force, and that this disproportionate terminate rate lends support to his contention that his race was the determining factor in his treatment in the disciplinary incidents at issue. In the court's opinion, the evidence presented provides too little information to be of probative significance, given the size of the statistical group. *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1257 (5th Cir.1977).

Instead, the evidence shows that both of these actions were taken in response to customer complaints concerning Brown's conduct. Plaintiff's complaint will therefore be dismissed.

A separate judgment shall be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.